# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN PATRICK WATERS,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 1:13-cv-00197-SMS<br><br>ORDER REVERSING AGENCY'S DENIAL OF BENEFITS AND REMANDING FOR FURTHER PROCEEDINGS |

Plaintiff John Patrick Waters, by his attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  Because the Administrative Law Judge ("ALJ") failed to obtain and fully consider the Veterans' Administration's ("VA") disability rating of Plaintiff, the Commissioner's denial of benefits is reversed, and this matter is remanded to allow the ALJ to obtain and fully consider the VA's determination.

I.  **Procedural History**

On October 23, 2009, Plaintiff applied for disability insurance benefits, alleging disability beginning October 16, 2009.  The Commissioner initially denied the claim on January 21, 2010, and upon reconsideration, on June 14, 2010.  On July 6, 2010, Plaintiff filed a timely request for a hearing.

///

1

1   Plaintiff appeared and testified at a hearing on September 28, 2011.  On October 20, 2011,

2   Administrative Law Judge James P. Berry denied Plaintiff's application.  The Appeals Council

3   denied review on December 12, 2012.  Plaintiff filed the complaint in this action on February 7,

4   2013.

5   **II.    Administrative Record**

6   **Plaintiff's testimony.**  Plaintiff (born April 16, 1968) completed high school and a two-year

7   associate degree.  He completed special training in telecommunications in 2004.  In 2009, he

8   performed seasonal maintenance work for the national park service, including painting and cleaning,

9   trail and road maintenance, and operating a jack hammer.  He stopped working as a result of seizures

10  that caused him to "zone out" or lose focus after a co-worker announced that he would no longer ride

11  in vehicles driven by Plaintiff.  Before that job, for five or six years, Plaintiff installed DSL, pulling

12  wire, configuring computers, and wiring phone lines for internet service.  Installing DSL connections

13  required Plaintiff to climb ladders, work on roofs, and perform his job responsibilities in other

14  situations hazardous to an individual who experiences uncontrolled and unexpected seizures.

15  Plaintiff was in the Marines from October 1986 to July 1990.  At the time of the hearing, Plaintiff

16  was unemployed and supported himself on VA unemployability payments.

17  Plaintiff began experiencing seizures in the late 1980's, apparently caused by a cancerous

18  brain tumor that was surgically removed in 1991.  Over time, his seizures have worsened.  At the

19  agency hearing, he testified that, although he was not aware when he was experiencing a seizure,

20  several times daily, he goes into a trance for thirty seconds to a minute.  For example, if he is driving

21  he might not see a red light and would simply continue forward.  After a seizure, Plaintiff feels very

22  tired or drained, and must lie down for several hours.  Plaintiff also reported progressive difficulty

23  with memory.

24  Loud noises and bright lights can trigger his seizures.  As a result he does not look at

25  television or computer screens.  Sometimes fluorescent lights bother him. He has not driven since

26  2009.

27  ///

28

2

Although his doctors have prescribed several drugs over the years, including Dilantin and Phenobarbital, Plaintiff chooses not to take them since they make him feel worse than when he has a seizure: numb and zombie-like.

On good days, Plaintiff is able to do house work or go shopping. On bad days, he just tries to rest. He enjoys reading for short periods, visiting, and talking on the phone. He tries to attend church weekly.

In his adult disability reports, Plaintiff reported that he stopped working on October 16, 2009, when his condition became so bad that he could no longer do his job. He explained that he had memory loss and difficulty concentrating that caused him to forget where he was supposed to be and the task that he was supposed to be doing. At times, he felt incompetent to make daily decisions. Sometimes, he "can't think." AR 171. Sometimes, he lost his balance or confused his left and right hands. Sometimes, he could not hear, smell, or see well. As the case progressed, Plaintiff received a hearing aid. His doctors attributed his hearing loss to his brain surgery.

Plaintiff was bothered by headaches that required him to rest and was depressed about his condition. In turn, his depression had caused his personal care to deteriorate. Loss of his driving privileges had imposed financial and emotional hardship on Plaintiff and his family,

Sometimes, he cooked simple meals such as beans or barbequed chicken or hamburgers. He feared he might burn down his house since he sometimes forgot that he had food cooking. He enjoyed time with friends and family, hunting and fishing, playing cards, and television.

In a written questionnaire, Plaintiff attempted to report the details of his treatment for the brain tumor, but admitted to having forgotten many of the particular procedures. He encouraged the agency to contact the VA physicians who had treated him in Palo Alto between 1990 and 1992, as well as his more recent treating physicians at local VA centers.[1] Plaintiff reported that he had previously tried several seizure medications, including Tegretol, Carbatrol, and Keppra, all of which caused unacceptable side effects including nausea, dizziness, depression, and decreased brain function.

---

[1] The Social Security Administration has established procedures for securing necessary information from the VA. *See* POMS DI 22505.022.

In a seizure questionnaire, Plaintiff reported two or three seizures daily.  He loses consciousness and has convulsions, but does not bite his tongue or lose bladder control. Seizures last approximately two minutes, leaving him numb and without memory.  Sometimes he can quickly resume his ongoing activity; sometimes he will require several minutes.  He did not take medication, choosing instead to watch what he ate or drank, and getting sufficient sleep.

**Wife's report.**[2]  Ruth Waters, Plaintiff's wife, recounted that Plaintiff might spend the day reading, working outside, or helping at church.  Such activities took him a long time. He had difficulty sleeping and woke frequently during the night.  He did not drive and could not remember written or oral instructions.  He cooked but forgot to turn off the stove.  He needed reminders to perform personal care and to turn off appliances.  Plaintiff was capable of handling his own finances in all respects and of shopping for things that he needed.

Plaintiff's ability to carry on a conversation had diminished with his concentration.  He sometimes had difficulty balancing.  His coordination was impaired.  His headaches caused his vision to blur.

Mrs. Waters recalled the frightening experience of driving with Plaintiff while he experienced a seizure: He drove through red lights at several intersections.  She noted that when Plaintiff had last tried to return to work, he held the job for only four months.  She emphasized Plaintiff's difficulty in admitting the extent of his deterioration and seeking disability assistance.

**Medical records**.  In April 2009, industrial physician Dwight James, M.D., treated Plaintiff for a sore throat and congestion at Porterville Valley PromptCare.  Later that month, Plaintiff returned to request a prescription for Viagra.  Plaintiff continued to see Dr. James to maintain his Viagra prescription.

Consultative clinical psychologist Greg Hirokawa, Ph.D., examined Plaintiff on behalf of the state agency on August 13, 2009.  Plaintiff reported memory problems, poor concentration, learning difficulties, word-finding difficulty, irritability, and easy frustration.  His recent physical problems and inability to work caused depression.

---

[2] When Ruth Guerrero completed the report, she was Plaintiff's fiancée.  She and Plaintiff later married.

Dr. Hirokawa evaluated Plaintiff's memory by asking him what he had eaten for breakfast and having him recall earlier life events.  Testing revealed normal intelligence.  Dr. Hirokawa diagnosed adjustment disorder with depressed mood and estimated Plaintiff's GAF to be 64.[3] Plaintiff's depression was mild to moderate and primarily attributable to work-related stress.  The doctor summarized:

- The claimant's ability to remember location and work-like procedures is mildly limited.
- His ability to remember and understand very short and simple instructions is mildly limited.
- The claimant's ability to understand and remember detailed instructions in mildly limited.
- His ability to carry out very short and simple instructions is mildly limited.
- The claimant's ability to maintain attention and concentration for extended periods is mildly limited.
- His ability to accept instructions from a supervisor and respond appropriately to criticism is mildly limited.
- His social judgment and awareness of socially appropriate behavior is mildly limited.
- The claimant's ability to perform activities within a schedule, maintain regular attendance, and be punctual is mildly limited.
- His ability to function independently and sustain an ordinary routine without special supervision is mildly limited.
- His ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace is mildly limited.
- The claimant's ability to interact with coworkers is mildly limited.
- The likelihood of the claimant emotionally deteriorating in a work environment is minimal.

AR 234 (*emphasis omitted*).

On August 16, 2009, Juliane Tran, M.D., who was certified in physical medicine and rehabilitation, conducted a nonfocal consultative neurological examination.  No records, progress notes, or radiographic reports were provided to her.  She reported that Plaintiff had experienced head tremors beginning in 1980 while he was in the Marines.[4]  Plaintiff had experienced grand mal seizures but could not recall his last grand mal seizure.  He also experienced other types of seizures, including 30-second-to-one-minute lapses of consciousness.  He experienced nonspecific numbing

---

[3] The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of a psychiatric diagnosis.  American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Test Revision 2000) (DSM IV TR).  An individual's GAF score contemplates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." excluding "impairment in functioning due to physical (or environmental) limitations."  *Id.* at 34.

GAF 64 is in the middle of the range 61-70 which indicates "[s]ome mood symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.* at 34.

[4] Since Plaintiff was twelve years old in 1980, it is unlikely that he was then in the Marines.

of the left side of his face as a warning sign.  Seizures continued after 1991 surgery to remove a brain tumor.  Since the surgery, Plaintiff experiences daily headaches lasting about eight hours in the form of sharp pain in the temporal region.

The results of Dr. Tran's physical examination of Plaintiff were generally normal.  Sensation in the left forearm and some left fingers was decreased.  Cranial nerves were normal.  Dr. Tran did not perform a funduscopic examination since Plaintiff complained that his eyes were very sensitive to light and shining light into his eyes caused his head to ache.  The doctor did not observe any visual field deficits.

Dr. Tran did not observe evidence of active or persistent seizures.  Her mental status examination indicated decreased short-term recall and decreased judgment for safety.  She opined:

> The claimant should be able to handle his own funds.  If he wants to drive he needs to pass a driving test.
>
> The claimant may be restricted with frequent climbing, balancing, or working at heights.
>
> The claimant would be restricted with lifting to no more than 50 pounds occasionally or more than 25 pounds frequently.
>
> There are no sitting, standing, or walking restrictions.
>
> There are no fingering, grasping, or overhead restrictions.
>
> There are no visual or environmental restrictions.

AR 238.

On November 18, 2009, Plaintiff was again treated by Dr. James at Porterville Valley PromptCare.  The medical notes report Plaintiff's complaint of seizures and diagnose seizures.

On December 11, 2009, Plaintiff's VA primary care physician, Ney M. Aung, M.D., referred him for a neurology consultation on an urgent basis (within seven days) and requested a CT scan of his head based on his recent lapses of consciousness.  Plaintiff, who had not taken medications since 1995, had discontinued Dilantin and Phenobarbital because of mental confusion.  Plaintiff was a poor historian regarding his seizure experience.

///

6

Audiologist Steven D. Meacham, Au.D., evaluated Plaintiff's hearing on December 11, 2009. Dr. Meacham identified mild notched sensorineural hearing loss in Plaintiff's right ear between 6000 and 8000 Hz. He found that Plaintiff's left ear had profound precipitous sensorineural hearing loss above 3000 Hz. Plaintiff received a hearing aid for his left ear on February 17, 2010, but sound mapping strips administered on that date are not included within the record.

On December 18, 2009, VA neurologist Hewitt F. Ryan, Jr., M.D., recommended that Plaintiff begin a trial of Keppra. Noting Plaintiff's seizures and intermittent spells of altered mentation, Dr. Ryan reported Plaintiff's condition to the DMV. Notes prepared by neurology resident Gretchen Jan Lactao, D.O., noted that Plaintiff originally had a tumor resected in 1991. He was now experiencing increased episodes of confusion, difficulty in decision making, and episodes of "blanking out." Generally, Plaintiff was feeling sluggish and was experiencing episodes of stuttering. He had headaches and photophobia (sensitivity to light). He was sometimes having tingling in both lower extremities at night. He denied loss of consciousness. Examination revealed mild decreased sensation in his left face. The doctors diagnosed small complex partial seizures, ordered an MRI to evaluate mass, prescribed Keppra, and told Plaintiff to stop driving.

VA radiologist W.J. Vlymen, M.D., Ph.D., evaluated a MRI administered to Plaintiff to whether his worsening mental status resulted from a new mass in his brain. Dr. Vlymen identified a small focus of postoperative gliosis[5] and encephalomacia[6] in the left tempor-occipital region with adjacent bony craniotomy defects. He found no other foci of abnormal signal in Plaintiff's brain or brainstem nor any foci of restricted diffusion. Vascular flow voids were present and unremarkable. Bones and extracranial soft tissue were unremarkable.[7]

Consultant J. Hartman, M.D., completed a physical residual capacity assessment on December 30, 2009. He found that Plaintiff had no exertional limitations. Since Plaintiff's seizures

///

---

[5] Gliosis is an excess of astroglia in damaged areas of the central nervous system. Dorland's Illustrated Medical Dictionary at 699 (28th ed. 1994). Astroglia is a collection of astrocytes, neurological cells of ectodermal origin, characterized by fibrous, protoplasmic or plasmafibrous processes, i.e., scar tissue. *Id.* at 152.
[6] Encephalomacia is softening of the brain. Dorland's Illustrated Medical Dictionary at 549.
[7] Dr. Vlymen's report gave rise to Dr. Loo's oft-quoted observation that Plaintiff's brain was "OK." *See* AR 396. The Court interprets this assessment to mean that Plaintiff had no new tumor or lesion although the aftereffects of his prior surgery were clearly still present.

were unchecked and unlimited, he found that Plaintiff required seizure precautions, including restrictions on driving, working at heights, or around hazards.

On January 12, 2010, psychologist Robert Liss, Ph.D., completed the psychiatric review technique. He found Plaintiff's psychological impairment, adjustment disorder with depressed mood, to be not severe. Dr. Liss assessed Plaintiff to have mild restriction of activities of daily living, mild difficulties in maintaining concentration, persistence, and pace, but no difficulties in maintaining social functioning, and no repeated episodes of decompensation.

Dr. Liss found Plaintiff to lack credibility, having represented problems with walking, although he could walk two to three miles and ride his bike, and having reported hearing loss, although that had been corrected with a hearing aid. In addition, said Dr. Liss, Plaintiff was currently working forty hours weekly.[8]

On January 18, 2010, Plaintiff advised Drs. Lactao and Liss that he had decided not to take Keppra for fear of side effects. The doctors discussed with him the potential dangers of seizures and loss of consciousness, including the potential for death and issues related to driving. On March 15, 2010, Plaintiff sought a refill of his Keppra prescription. By May 2010, Plaintiff had discontinued using Keppra, which caused sedation. Plaintiff's primary care physician, Swee-Chin Loo, M.D., then prescribed Gabapentin to address Plaintiff's headaches and seizures.

On May 5, 2010, Plaintiff contacted the VA to report shortness of breath at night. A sleep study conducted in November 2010 revealed no evidence of sleep apnea.

A summary list of Plaintiff's health problems printed by the VA on May 17, 2010, listed dental problems, partial hearing loss, and chronic organic brain syndrome. Plaintiff's disability consisted of a seizure disorder, paralysis of the seventh and tenth cranial nerves, brain syndrome, and loss of a portion of his skull.

Agency records noted emergency room treatment at the Fresno VA Hospital in early June 2010.

///

---

[8] Nothing else in the record indicates that Plaintiff worked after October 2009.

On May 5, 2011, Plaintiff again consulted Dr. James regarding his seizures.  On May 19, 2011, a VA treatment note reported that Plaintiff was then receiving neurology care from a source outside the VA.  Plaintiff continued to visit Dr. James on a regular basis thereafter.

On July 19, 2011, Dr. James wrote to Plaintiff's attorney that Plaintiff had petit mal epileptic seizures, which caused him to lose concentration, altered his awareness, and produced absence and loss of memory after a seizure.  Dr. James opined that Plaintiff was not employable due to his inability to perform daily functions with consistency.

**Veteran's Administration Disability Determination.**  On March 15, 2010, a Veteran's Administration Review Officer declared that Plaintiff was entitled to individual employability and basic eligibility for dependents' educational assistance effective October 17, 2009.  The determination does not set forth evidence relevant to Plaintiff's disability, referring to and incorporating by reference the VA's rating action dated September 10, 2009.  The rating action is not included within the record.

**Vocational expert.**  Thomas Dachelet testified as vocational expert.  He identified Plaintiff's forest service work as akin to janitor (381.687-018, medium, SVP 2) or forestry laborer (408.667-010, heavy, SVP 4).  Mr. Dachelet opined that as performed, Plaintiff's job was best considered medium work, SVP 2.  Plaintiff's prior work as a DSL installer was electronic mechanic (828.261-022, medium, SVP 7, skilled).

For the first hypothetical question, Judge Berry directed Mr. Dachelet to assume a hypothetical individual 43 years of age with an associate degree and the past relevant work experience just described.  The individual has a combination of severe impairments and retains residual functional capacity to lift and carry 100 pounds occasionally, 50 pounds frequently, and  to stand, walk, and sit for six hours each.  The individual must avoid exposure to unprotected heights, dangerous moving machinery, and operation of motor vehicles.

Mr. Dachelet opined that due to the inability to drive alone, the hypothetical individual could not perform any of Plaintiff's past relevant work.  The individual could perform heavy work including poultry worker (525.687-082) (11,936 jobs in California; 87,024 jobs in U.S.); farm

worker 2 (404.687-010) (22,079 California; 116,578 U.S.); or house cleaner (323.687-018) (14,518, California; 123,793, U.S.).

For the second hypothetical question, Judge Berry directed Mr. Dachelet to assume a hypothetical individual with same vocational background as in the first question. The individual, who has multiple severe impairments, has the residual functional capacity to lift and carry a maximum of ten to fifteen pounds; to stand two to four hours; to walk 100 or more yards; to sit two to four hours. The individual would require unscheduled work breaks lasting one or more hours. He must avoid exposure to unprotected heights, dangerous moving machinery, and operation of motor vehicles. The individual would have difficulty maintaining concentration, persistence, and pace, and would be absent from work about four days weekly. Mr. Dachelet opined that such an individual could not perform claimant's past work or any other job.

For the third hypothetical question, Plaintiff's attorney directed Mr. Dachelet to assume an individual with the same vocational background as Plaintiff who would lose concentration for thirty seconds to a minute three to five times a day at unpredictable times. The individual would lose memory during the periods of lost concentration. Mr. Dachelet opined that, particularly at the unskilled level, the hypothetical person would be unlikely to maintain any job for more than a brief time period.

## II.   Discussion
### A.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

Step one:      Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:      Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:    Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:     Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:     Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of October 16, 2009.  His single severe impairment was his seizure disorder (petit mal).  This impairment did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  Plaintiff was capable of performing a full range of work at all exertional levels but should avoid exposure to unprotected heights, dangerous moving machinery, and operation of motor vehicles.  Plaintiff could not perform his past relevant work.  The ALJ concluded that jobs that Plaintiff could perform existed in significant numbers in the national economy.

**B.      Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C.

11

§ 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's."  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

## C.   **Plaintiff's Credibility**

Plaintiff contends that the ALJ erred in determining that Plaintiff was not fully credible based on his failure to take prescribed anti-epileptic medication.  Not surprisingly, the Commissioner disagrees.

An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007).  "[I]n assessing a claimant's credibility, the ALJ may properly rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (*internal quotation marks and citations omitted*).  *See also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

A disability claimant's reported symptoms may suggest greater impairment than may be apparent from objective medical evidence alone.  S.S.R. 96-7p.  Evaluating symptom testimony

1  requires an adjudicator to consider the full administrative record to determine the credibility of a

2  claimant's testimony.  *Id.*  A claimant's failure to follow prescribed treatment may undermine his or

3  her credibility if he or she lacks good reasons for noncompliance.  *Id.*  Good reasons may include a

4  claimant's (1) carefully structuring daily activities to minimize symptoms to a tolerable level or

5  eliminate them entirely; (2) using over-the-counter medications; (3) avoiding a prescription

6  medication that causes side effects that are more severe or less tolerable that the symptom it is

7  intended to address; (4) lacking both the resources to afford treatment and access to free or low-cost

8  treatment; (5) receiving medical advice that no further effective treatment would benefit the

9  claimant; or (6) observing religious tenets or teaching that preclude the medical treatment.  *Id.*  In

10  addition, of course, the claimant's symptoms may simply not be severe enough to prompt the

11  claimant to seek medical attention or to comply with prescribed treatment.  *Id.*

12        "Impairments that can be controlled effectively with medication are not disabling for the

13  purpose of determining eligibility for [disability] benefits."  *Warre v. Commissioner of Social*

14  *Security Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).  Ninth Circuit case law is replete with

15  examples of adverse credibility determinations having been drawn when a claimant asserted a

16  debilitating impairment but only presented evidence of minimal or conservative treatment.  For

17  example, a claim of debilitating back pain was belied by its favorable response to conservative

18  treatment including physical therapy, anti-inflammatory medication, a TENS unit, and a lumbo-

19  sacral corset.  *Tommasetti*, 533 F.3d at 1040.  *See also Fair*, 885 F.2d at 604 (despite claiming severe

20  and progressive back pain for many years, Mr. Fair had received only minimal conservative

21  treatment and had not been treated or hospitalized in over two years); *Parks v. Astrue*, 304

22  Fed.Appx. 503, 506 (9th Cir. 2008) (finding claimant's testimony not credible since (1) her accounts

23  of treatment and effects of medication were inconsistent with her medical records and (2) she had

24  unilaterally stopped taking her anti-seizure medications).  *Cf. Johnson v. Shalala*, 60 F.3d 1428,

25  1433 (9th Cir. 1995) (physician's opinion that Plaintiff was disabled was inconsistent with his

26  contemporaneous finding that Plaintiff was only temporarily disabled and required nothing more

27  than a period of conservative care).

28

Adverse credibility determinations frequently occur in disability claims in which an individual claiming epilepsy is noncompliant or not fully compliant with his or her anti-epileptic medication. *See Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001). Pursuant to 20 C.F.R. Pt. 404, Subpt. P. Appx. 1, §11.00A, an impairment cannot meet the epilepsy listing unless it "persists despite the fact that the individual is following prescribed anticonvulsive treatment." *Id.* Even when a claimant is taking an anti-epilepsy drug, an ALJ can determine the extent of his compliance with prescribed medication by evaluating the results of blood level testing by the claimant's physician at the claimant's regular appointments. *Id.* Accordingly, an ALJ can typically determine whether a claimant's seizures are uncontrolled or uncontrollable.

In this case, the ALJ concluded that since Plaintiff had not complied in taking prescribed medications, his symptoms were likely not as limiting as Plaintiff alleged. Plaintiff contended that because anti-epileptic drugs as a class cause him unacceptable drowsiness, he is unable to take them.

"Like pain, side effects of medications can have a significant impact on an individual's ability to work and should figure in the disability determination process." *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 585 (9th Cir. 1988). Since side effects are "highly idiosyncratic," an adjudicator should not trivialize a claimant's testimony regarding their limiting effects, and must make specific findings documenting his or her reasoning in rejecting the claimant's testimony. *Id.* The ALJ did not trivialize Plaintiff's claim of drowsiness but concluded that Plaintiff failed to carry his burden of proving that adverse side effects existed and were sufficiently severe to justify Plaintiff's decision not to take any anti-epileptic drug.

The ALJ correctly observed that the medical records included no documentation that anti-epileptic drugs made Plaintiff drowsy except for Plaintiff's own subjective reports. He emphasized that Plaintiff did not try any of the various medications prescribed by his VA physicians even after the doctors emphasized the serious risks, including potential death, associated with his decision not to do so. If an epilepsy patient is not compliant with prescription anti-seizure medication, it is impossible to determine whether his or her seizures indicate drug inefficacy or whether they simply

///

1    result from the claimant's failure to follow prescribed treatment.  *Pa Dee Thao v. Astrue*, 2011 WL

2    2516151 at * 10 (E.D.Cal. June 21, 2011) (No. 1:10-cv-00244-SKO).

3        Plaintiff refused anti-epileptic medication based on his experience taking Dilantin and

4    Phenobarbital in the early 1990's, immediately after resection of his brain cancer.  Wanting to give

5    Plaintiff the benefit of the doubt, this Court briefly considered whether to remand this matter for

6    further investigation of medical records relevant to those medications.  Upon reflection, the Court

7    rejected this alternative.  Plaintiff testified that he stopped taking medication in 1995, when his

8    physician told him he no longer needed to take it.  Assuming the accuracy of Plaintiff's recollection,

9    the 1995 decision that Plaintiff no longer needed to keep taking anti-seizure medication is

10   sufficiently remote to have minimal probity now.  This is especially true since Plaintiff was capable

11   of performing work without seizure precautions, notably installation of DSL connections, well after

12   1995.  If Plaintiff's seizure pattern and other mental processes have now changed sufficiently to

13   preclude Plaintiff's employment, as he now contends, the balance of beneficial effects to side effects

14   of anti-epileptic drugs also requires reassessment.  As the ALJ observed, Plaintiff's unwillingness to

15   follow his neurologists' advice to now try anti-epileptic medication suggests that the alleged

16   worsening of his condition is not as great as Plaintiff contends.

17       In addition, Plaintiff elected to discontinue receiving care from VA neurologists in favor of

18   Dr. James, an industrial physician serving the Porterville area from a prompt care clinic.  Although

19   the ALJ did not address Plaintiff's decision, this Court notes that choosing to discontinue care by

20   physicians specializing in neurology in favor of a non-specialist also suggests that Plaintiff's

21   condition may not be as serious as he alleged.

22       Invocation of adverse credibility determinations is typically buttressed by other bases

23   indicating lack of credibility.  Mr. Tommasetti declined recommended back surgery, explained his

24   failure to attempt sedentary work vaguely, could not remember whether his physician had prescribed

25   his cane, and testified inconsistently regarding the effect of his severe diabetes.  *Tommasetti*, 533

26   F.3d at 1040.  Although Mr. Fair testified that he was " confined primarily to resting and reclining

27   about his own home," he also testified that he remained capable of caring for all of his personal

28

                                                    15

needs, including household maintenance, shopping, riding public transportation, and driving his own car. *Fair*, 885 F.2d at 604.

Here, the ALJ found that Plaintiff reported daily activities inconsistent with his claimed degree of disability.  An ALJ may properly discredit a claimant's subjective testimony as inconsistent with his or her daily activities and other conduct.  *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002); *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999).  Although his accounts were inconsistent from time to time, Plaintiff reported the ability to walk for a substantial time period, live alone prior to his marriage, perform household tasks inside and outside, go out alone, visit friends, read, watch television and movies, and perform personal care.  He told Dr. Hirokawa he vacuumed, did laundry, swept, and did yard work. He worked full time until the end of his seasonal position with the national park service in October 2009.  He drove until VA physicians reported his seizures to the DMV, which then revoked his driver's license.  "[T]he ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting."  *Molina*, 674 F.3d at 1113.  "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that the contradict claims of a totally debilitating impairment." *Id.*

In evaluating a claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." *Smolen*, 80 F.3d at 1284.  Such techniques include inconsistencies in the testimony itself or inconsistencies between the claimant's testimony and behavior. *Tommasetti*, 533 F.3d at 1039.  Early in the administrative process, agency medical staff noted that Plaintiff's inconsistent reports undermined his credibility.  The ALJ noted additional inconsistencies in the hearing decision.  Plaintiff himself candidly disclosed difficulties with memory and thought processes.

In an apparent attempt to echo the *Tommasetti* Court's contrast of Mr. Tommasetti's refusal to undergo the back surgery that might have relieved his pain with his choosing to undergo cosmetic surgery, the ALJ here contrasted Plaintiff's reluctance to take anti-epileptic drugs with his taking Viagra in spite of its side effects.  The ALJ's comment was not only a mean-spirited "cheap shot," it was factually incorrect.  Plaintiff, newly wed for the first time while his disability application was

pending, declined to take the erectile dysfunction medication available through the VA because it caused him to experience intolerable headaches.  He elected instead to obtain Viagra through Dr. James since using Viagra did not result in side effects.

Questions of credibility and resolution of conflicts in the evidence are reserved solely to the Commissioner.  *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).  If the ALJ interpreted the claimant's testimony reasonably and his determination is supported by substantial evidence, the Court may not substitute an alternative interpretation.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).  Substantial evidence and proper legal reasoning supported the ALJ's conclusion that because of Plaintiff's election to reject prescription anti-epileptic medication, his claims were not fully credible.

## D.     Dr. James' Opinion

Plaintiff contends that the ALJ erred in rejecting Dr. James' opinion that Plaintiff was unemployable.  The Commissioner counters that the ALJ was not bound by Dr. James' opinion since it infringed on the ultimate determination of disability, an issue reserved to the Commissioner.  The Court agrees with the Commissioner that Dr. James' opinion was not binding on the ALJ.

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and (b) the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] or treat[ed] the claimant (nonexamining physicians)."  *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally

entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of a nontreating physician. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tommasetti*, 533 F.3d at 1041; S. S. R. 96-5p. Since Dr. James' letter sets forth his conclusory opinion that Plaintiff is disabled, the ALJ was not bound by that opinion.

Further analysis indicates that even if Dr. James' opinion were not conclusory, the ALJ need not have given it controlling weight. Although the medical records indicated that Dr. James treated Plaintiff over an extended time span, consistent with Dr. James' industrial medicine specialty and his operation of a prompt-care clinic, his treatment of Plaintiff generally addressed minor acute illnesses such as bad colds or congestion, and the prescription and monitoring of medication to address Plaintiff's erectile dysfunction. Treatment notes concerning Plaintiff's seizure disorder consisted of Dr. James' recording Plaintiff's report of his symptoms and a diagnosis of seizures. Nothing in the record indicates that Dr. James ordered any type of testing or other objective evaluation of Plaintiff's seizure condition, or that he ever reviewed records of the prior treatment Plaintiff's seizures by neurologists or neurosurgeons. No basis for Dr. James' opinion appears within the record other than Plaintiff's own representation of his condition and its effect on his ability to function.

An ALJ need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751. Indeed, an ALJ is not required to accept the opinion of any physician, including a treating physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings. *Thomas*, 278 F.3d at 957. In short, the ALJ did not err in rejecting Dr. James' conclusory opinion.

### E.        Veterans' Administration Disability Determination

Plaintiff contends that the ALJ erred by failing to articulate the consideration given to the VA's disability finding in accordance with S.S.R. 06-03p.  The Commissioner counters that the ALJ properly rejected the VA's determination without comment since the VA's determination "had no probative value."  Doc. 19 at 12.  The Commissioner adds that the VA determination could be rejected since its findings were inconsistent with the evidence in the administrative record before the SSA.  Two facts stand in the way of the Commissioner's argument: (1) the written administrative decision did not articulate a basis for the ALJ's ignoring the VA's disability determination, and (2) the administrative record does not include a copy of the VA's disability determination.

The ALJ noted that Plaintiff had testified that the VA found him unemployable.  He added that according to the record, the only seizure limitations set forth by VA neurologists were that Plaintiff not drive.  The administrative decision does not mention the VA's granting Plaintiff unemployability benefits effective October 17, 2009, nor consider the October 11, 2009 disability rating action on which the benefits determination was based.

A determination made by another agency (e.g., Workers' Compensation, the Department of Veteran's Affairs, or an insurance company) that a claimant is disabled or blind is not binding on the Commissioner.  S.S.A. 06-03p.  Nonetheless, because of the marked similarity between the programs, "an ALJ must ordinarily give great weight to a VA determination of disability."  *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002).  The Ninth Circuit opinion noted:

> Both programs serve the same governmental purpose—providing benefits to those unable to work because of a serious disability.  Both programs evaluate a claimant's ability to perform full-time work in a national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims.  *Compare* 38 C.F.R. § 4.1 et seq. (VA ratings) *with* 20 C.F.R. § 404.1 et seq. (Social Security Disability).  Both programs have a detailed regulatory scheme that promotes consistency in adjudication of claims.  Both are

19

administered by the federal government, and they share a common incentive to weed out meritless claims.  The VA criteria for evaluating disability are very specific and translate easily into the SSA's disability framework.  Because the VA and SSA criteria for determining disability are not identical, however, the ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record.  *See* [*Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001)] (ALJ need not give great weight to a VA rating if he "adequately explain[s] the valid reasons for not doing so.").

*McCartey*, 298 F.3d at 1076.

The Commissioner's argument that the VA determination had little application since an ALJ "must determine the issue of disability based on the Social Security Act and its implementing regulations" (Doc. 19 at 12) is inadequate in light of *McCartey* and related precedent.  Contrary to the Commissioner's assertion that the VA disability determination had "no probative value" (Doc. 19 at 12), *McCartey* and its progeny tell us that an ALJ must give a claimant's VA disability determination "great weight."  In other words, determining the issue of disability based on the Social Security Act and its implementing regulations requires the ALJ to carefully consider a VA disability determination and, if he or she decides to reject its findings, to articulate in the written agency opinion why he or she rejected the VA's assessment, setting forth "persuasive, specific, valid reasons for doing so that are supported by the record."  *See McCartey*, 298 F.3d at 1076.  "'Because the VA and SSA criteria for determining disability are not identical,' [the Ninth Circuit has] allowed an ALJ 'to give less weight to a VA disability rating if he gives persuasive, specific valid reasons for doing so that are supported by the record.'"  *Valentine v. Commissioner, Social Security Admin.*, 574 F.3d 685, 695 (9th Cir. 2009), *quoting* McCartey, 298 F.3d at 1076.

When an ALJ rejects the VA's disability opinion without providing persuasive, specific, valid reasons, the administrative decision is not "'supported by substantial evidence and free from legal error.'"  *Ames v. Astrue*, 2012 WL 1191862 at *5 (D. Ariz. April 12, 2012) (No. CIV 11-163-TUC-GEE), *quoting Fair*, 885 F.2d at 601.  Accordingly, this Court cannot affirm the administrative

20

decision that Plaintiff is not entitled to disability insurance benefits since it cannot conclude that the decision is supported by substantial evidence and free from legal error.

Although it may be true that the ALJ could have rejected the VA determination as inconsistent with the evidence before him, as the Commissioner contends, the administrative decision did not articulate such a basis for ignoring the VA determination. The Commissioner's argument that the ALJ could disregard the VA determination without further discussion is not consistent with applicable law. The Commissioner's after-the-fact rationalization is not an acceptable method of resolving the omissions in the administrative decision.

"[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Securities and Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If those grounds are inadequate or improper, a reviewing court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. *Id.* For example, where the Commissioner conceded that the ALJ did not conform to the express requirements of a social security ruling (S.S.R.) that required the ALJ to include in the written administrative decision findings of facts regarding the claimant's skills and their transferability, the district court erred in reviewing the ALJ's findings "based on what it assumed the ALJ to have determined." *Bray v. Commissioner of Social Security Admin.*, 554 F.3d 1219, 1226 (9th Cir. 2009).

"Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Id.* at 1225. In other words, "'the required explanation must be articulated by the agency at the time of its action.'" *Maryland Native Plant Soc. v. U.S. Army Corps of Engineers*, 332 F.Supp.2d 845, 856 (D.Md. 2004), *quoting Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001).

The ALJ's error is compounded by his failure to secure a copy of the VA's October 11, 2009 rating determination. The perfunctory March 15, 2010 review officer decision relied, in major part, on the evidence reflected in the October 11, 2009 rating determination. AR 311. Without a copy of the disability rating determination, neither the ALJ, the Commissioner, nor this Court can determine the basis for the VA's disability ratings from the existing administrative record.

When the record is incomplete or ambiguous, an ALJ has the duty to conduct a proper inquiry regarding a claimant's disability rating. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011). The ALJ did not do so here. When the record indicates that a claimant has received a VA disability rating but the disability rating is not included within the administrative record, the ALJ's failure to obtain and consider the claimant's VA disability rating denies the claimant to "full and fair hearing" to which he is entitled. *Id.*

"[T]he failure to comply with *McCartey* requires remand." *Sundseth v. Astrue*, 2010 WL 519730 at *5 (W.D.Wash. Feb. 10, 2010) (No. C09-387-RSL). Accordingly, this Court will reverse the ALJ's determination and remand this case, directing the ALJ to obtain and analyze the October 11, 2009 disability rating action in accordance with the requirements of applicable law.

**III.   Conclusion and Order**

This Court orders that the administrative determination be REVERSED and the case REMANDED for further proceedings in accordance with this opinions. The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff John Patrick Waters and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **March 26, 2014**             **/s/ Sandra M. Snyder**
                                   UNITED STATES MAGISTRATE JUDGE

22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28